IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2004 Session

## CHRISTA GAIL PIKE v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Knox County
No. 68280     Mary Beth Leibowitz, Judge

### No.  E2002-00766-CCA-R3-PD - Filed July 15, 2004

The petitioner, Christa Gail Pike, appeals as of right from an order denying her motion to reinstate a petition for post-conviction relief.  Her counsel had previously appealed an order approving the withdrawal of the post-conviction claim.  In this appeal, the petitioner asserts (1) that an inmate under a sentence of death should not be permitted to waive post-conviction review of a capital case; (2) that the hearing conducted by the post-conviction court to determine whether her decision to waive further challenges to her conviction and sentence did not comply with due process requirements; and (3) that the post-conviction relief petition was not properly withdrawn.  This court concludes that the petitioner, under a capital sentence, may waive post-conviction review; that the hearing was in compliance with due process standards; and that the evidence supported the findings that the petitioner was competent to withdraw her post-conviction petition and that her decision to do so was voluntarily and knowingly made.  The judgment of the post-conviction court allowing the withdrawal of the post-conviction petition is affirmed.  The order denying the motion to reinstate the petition is also affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Donald E. Dawson and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, Christa Gail Pike.

Paul G. Summers, Attorney General and Reporter; Alice B. Lustre, Assistant Attorney General; and Leland Price and S. Jo Helm, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

In 1995, the petitioner and the victim, Colleen Slemmer, were students at the Job Corps Center in Knoxville. On the day before the murder, the petitioner, explaining that she "just felt mean," informed another student at the center, Kim Iloilo, that she intended to kill the victim. On the next evening, the petitioner, her boyfriend, and another student left the Job Corps Center accompanied by the victim. All but the victim returned. Later, the petitioner told a friend, Stephanie Leigh Wilson, that she had killed the victim and saved a piece of her skull as a souvenir.

At trial, it was established that the petitioner admitted that she had cut the victim's throat six times, beaten her, and thrown a piece of asphalt at her head while the victim had begged "them" to stop. The body was found nude from the waist up. A pentagram had been carved into the chest. An autopsy confirmed numerous slash and stab wounds, bruising consistent with crawling, and defensive wounds. Death was determined to be the result of blunt force injuries to the head. In her statement to the police, the petitioner acknowledged responsibility for the killing but refused to name the other two individuals at the scene. At trial, however, a witness testified that on the day of the murder, the petitioner and the victim were accompanied by Tadaryl Shipp and Shadolla Peterson.

Dr. Eric Engum, a clinical psychologist who had examined the petitioner, described her as an "extremely bright young woman" with an IQ in the 77th percentile, "remarkable," he said, for a person with a ninth-grade education. Dr. Engum made a diagnosis of a severe borderline personality disorder but concluded that the petitioner had no symptoms of brain damage and was not insane.

The jury returned guilty verdicts of first degree murder and conspiracy to commit first degree murder. The jury also found that the three applicable aggravating circumstances, Tennessee Code Annotated section 39-13-204(1), (5), and (6), outweighed the mitigating circumstances beyond a reasonable doubt and sentenced the petitioner to death for the first degree murder. The trial court imposed a twenty-five-year sentence, which was ordered to be served consecutively, for the conviction of conspiracy to commit first degree murder. On direct appeal, this court affirmed. State v. Christa Gail Pike, No. 03C01-9611-CR-00408 (Tenn. Crim. App., at Knoxville, Nov. 26, 1997). Later, our supreme court affirmed both the convictions and the sentences, finding that the evidence was sufficient to support each verdict and the sentence of death. It also ruled that capital punishment was not disproportionate under the circumstances of the case. State v. Pike, 978 S.W.2d 904 (Tenn. 1998), cert. denied, 526 U.S. 1147 (1999).

On June 3, 1999, the petitioner filed a timely pro se petition for post-conviction relief. She alleged that her conviction was based on a coerced confession and unlawfully obtained evidence, that her right against self-incrimination had been violated, and that the prosecution had violated its duty to disclose evidence favorable to the defense. In addition, the petitioner contended that her trial counsel had been ineffective in a number of ways. The post-conviction court appointed the Office of the Post-Conviction Defender to represent the petitioner. Attorneys Donald E. Dawson and

Stefanie M. McArdle were assigned to her case.

On June 30, 2000, Ms. McArdle, who had moved her law practice to Kentucky, filed a motion requesting permission to continue representing the petitioner pro hac vice. According to her affidavit, Attorney McArdle was not licensed in Tennessee but had been authorized to practice at the Post-Conviction Defender's Office pursuant to Tennessee Supreme Court Rule 7, Section 10.04. She had worked with the petitioner since September of 1998. The post-conviction court granted the motion for her to proceed pro hac vice with Attorney Dawson to act as lead counsel. On May 31, 2001, the state filed a motion to revoke McArdle's pro hac vice status, questioning her authority to practice law in Tennessee and contending that she had violated both state law and ethical standards.

Less than a month later (and one year before the eventual hearing on the request) during a hearing concerning McArdle's status as counsel, the petitioner announced to the court, "I would like to relinquish the rest of my appeals in this case." The post-conviction court cautioned the petitioner that if that was her genuine desire, she would need to file something in writing. When the petitioner responded that she wasn't getting "much cooperation" from her attorneys, the post-conviction court advised her to talk with her attorneys and listen to their advice. The court suggested that it would be best for the petitioner to file an affidavit of her own and for her attorneys to file a motion outlining their position. The petitioner was informed that she could present any issue she chose but also had the "right to change [her] mind and not put [the petition] before the court." On September 4, 2001, the petitioner wrote a letter to the post-conviction judge declaring her intent to withdraw her petition and to proceed to the sentence.

On October 9, 2001, McArdle filed a motion to withdraw as co-counsel based in part on her belief that the state's pending motion to revoke her pro hac vice status undermined her relationship with the petitioner. Two weeks later, the post-conviction court granted the motion to withdraw as counsel. At that point, the petitioner was again asked whether she still wanted to dismiss her post-conviction petition. The court questioned the petitioner under oath regarding the contents of the letter and asked if she was aware that her counsel had filed a motion for an evidentiary hearing to determine her competency to withdraw her request for post-conviction relief. The petitioner expressed full understanding of her counsel's motion, acknowledged that she had discussed her letter with her attorneys, and confirmed that she was aware that the withdrawal of the petition would adversely affect her procedural options. The post-conviction court also permitted the state and petitioner's counsel to file responses to the petitioner's request to waive any further challenges to her conviction and sentence, ruling that it would consider her request and then determine if a competency evaluation should be ordered. The post-conviction court, while observing that "[w]e are all plowing fairly new ground," emphasized the need to proceed carefully in order to properly preserve the rights of the petitioner. When the court commented, "Clearly, it is Miss Pike's choice, what to do, as long as she is competent to do this," post-conviction counsel disagreed, asserting that it was not "an absolute given that she has a right to withdraw her petition." The court ultimately concluded that it was "obligated by due process concerns" to order a competency evaluation and appointed Dr. William Kenner, who was able to begin treatment in December, to assess the petitioner's ability to make decisions regarding the post-conviction litigation.

At a hearing on June 25, 2002, almost one year after the petitioner first expressed her desire to withdraw her petition, the post-conviction court again placed her under oath and asked whether she still wished to withdraw her "appeals." The petitioner responded in the affirmative, after which a recess was declared to give the petitioner an opportunity to discuss the content of Dr. Kenner's report with her attorneys. After the recess, the court set out the "road map" it would follow in response to the petitioner's request to withdraw her petition, beginning by hearing any proof "as to the issue of whether or not Miss Pike is making a conscious, free choice" and "not in a manner in which her will has been overborne by other things at this point." The post-conviction court next expressed its intention to advise the petitioner of her full panoply of procedural rights and ask her other questions pertinent to the pending claims. The court declared that it would then hear counsel's arguments concerning the petitioner's competence, observing that "anytime up until the . . . decision, if Miss Pike should change her mind . . . I will, of course, allow her to do so and withdraw [her] request" to terminate the post-conviction proceeding. The court ruled that the burden was upon petitioner's counsel to demonstrate that she was not competent to withdraw her appeals.

The petitioner's counsel expressed reservations about their readiness to proceed on the day of the hearing. They had first received a copy of Dr. Kenner's report that same morning. The post-conviction court had declined to appoint additional experts to assist counsel for the petitioner. There was, however, no request for a continuance. Counsel then made the following observation:

> I guess the other issue is the issue of the word competent – because I think, as Dr. Kenner has probably correctly found, Miss Pike is competent. Then the issue becomes whether due to other things, including – in light of her mental illness, whether other things such as prison conditions and other matters have overborne that will; and, therefore, this is still not a knowing and intelligent waiver. And I think that's, of course, where we are in this case.

After acknowledging that counsel had consulted other experts on the issue of the petitioner's mental status in preparing the post-conviction proceeding and that the findings of the other experts were also discussed in Dr. Kenner's report, the post-conviction judge questioned the petitioner about her understanding of the nature and strength of her post-conviction petition and inquired whether she understood that her attorneys "believe and have come before the court with issues they feel are good, valid issues." After being assured that she had an absolute right to have counsel present these issues, the petitioner was advised that she could possibly win a new trial or be released from custody. After assuring the court that she understood that she might be entitled to a new trial, the petitioner declared that she did not "want to pursue any of that." The petitioner insisted that she fully understood that she would be forever barred from re-asserting her post-conviction claims if she was allowed to withdraw the petition. Upon receiving those assurances, the post-conviction court found "that what Miss Pike is telling me . . . she does not wish to adjudicate those [post-conviction] issues, at least at this point" and then allowed the presentation of evidence.

Lisa Ratte, a nurse at the Tennessee Prison for Women (TPW), testified that she met the petitioner in 1996 on a medical visit. She described the petitioner as being "treated pretty badly"

during her incarceration. Ms. Ratte, who wrote to and regularly visited Pike after she left her job at the prison, recalled that during one visit, the petitioner hinted that she might withdraw her post-conviction petition. Describing the petitioner as "very upset" at that time because her mother had moved to Texas, Ms. Ratte recalled that the petitioner eventually agreed to continue her challenge to the conviction and sentence. Ms. Ratte testified that at the time of the hearing, she had not been permitted to visit with the petitioner for more than a year and prison officials had reduced the petitioner's telephone usage from once daily to one call per month in the six months prior to the hearing. Ms. Ratte confirmed that in subsequent correspondence and telephone conversations, the petitioner expressed a desire to discontinue her legal proceedings. It was her opinion that the petitioner had "given up hope," largely because her former attorney, Ms. McArdle, had withdrawn from the case. Ms. Ratte claimed that except for three or four months, the petitioner's prison time had been spent in isolation.

The petitioner, who had been housed in a segregated unit at the prison, testified that for the first year and a half of her imprisonment, she was allowed to go outside for recreation with the other inmates but afterward could go outdoors only while alone. She stated that during those periods, she was restrained by handcuffs and shackles. The petitioner recalled that for a time, she had worked as a teacher's assistant and had taught some of the other inmates to read; however, after an incident in which she was cited for creating a disturbance, she lost the job and was no longer allowed to interact with the general population. The petitioner testified that her cell was searched twice daily and her personal property was often ransacked or destroyed.

The petitioner testified that for the last year and one-half of her incarceration, she had been in "punitive segregation" because prescription medicine had been found in the wall of her cell. She claimed that during this period of punishment, everything was taken from her except hygiene items, clothing, and religious items. She stated that she often slept during the day, staying awake at night, and that until she was prescribed lithium, she frequently went without sleep for as many as two to three days at a time. She testified that she had recently been moved to a new facility where her cell was smaller and where she remained segregated from the prison population. The petitioner claimed that the noise was "horrendous" at the older unit where some women continuously screamed or taunted other of the prisoners. She described the noise level as better in the new cell but less than desirable because voices could still be heard through the vents. The petitioner, who described herself as a "very affectionate person," testified that she had been without a human contact visit during the past year and a half except for visits with her attorneys. She stated that she rarely went for recreation in the new facility because there was no equipment and little to do outside. Permitted to use the telephone only twice per month, the petitioner testified that she had trouble making calls to her attorneys and was not allowed to have private telephone conversations like other inmates. On cross-examination by the state, however, the petitioner acknowledged that despite her dissatisfaction with her environment, the prison conditions had nothing to do with her desire to drop her post-conviction claim.

Jennifer Szostecki, who met the petitioner while incarcerated in the segregation unit at TPW, testified that the petitioner slept a lot and seemed more relaxed than when she first met her in August

2001. Ms. Szostecki contended that prison policy required a rotation of the recreation period but the policy was not followed. She explained that recreation time was always set at 7:00 a.m. when the petitioner was still asleep. Ms. Szostecki testified that there were times when the petitioner acted "really hyper" in an effort to relieve her depressed state and that on other occasions, the petitioner would stare at the wall and "close off her mind to the world." She contended that the petitioner was not allowed to have things that other inmates were permitted, that she was subjected to more searches, and that she was often awakened by officers, in her opinion, for no reason other than harassment. It was her view that the petitioner did not really want to die but that she just did not want to live "the rest of her life in the penitentiary where people will f---- with you all the time."

Following testimony of the witnesses and in response to questions by the post-conviction judge, the petitioner testified that reviewing Dr. Kenner's report with counsel had not changed her mind but she did point out that Dr. Kenner had incorrectly reported that she was in segregation by choice. The petitioner also expressed an awareness that if she were allowed to waive her post-conviction claim, her execution would be "very soon." She explained that nothing about the post-conviction proceedings, including the withdrawal of Ms. McArdle as counsel, had contributed to her decision to dismiss her "appeals" and assured the court that she had typed and mailed the request for the dismissal herself. The petitioner confessed that she understood her right to have post-conviction review and that no one had coerced her to withdraw her petition. She also stated that she was aware that the withdrawal of the petition would not toll the statute of limitations and might also result in the waiver of claims in any future state or federal action. The petitioner confirmed that lithium made her "a lot calmer, less nervous, less manic" and allowed her to think "more clearly."

The petitioner agreed with Dr. Kenner's assessment that she suffered from mental disease and confirmed that the disorder did not prevent her from understanding her legal options. She emphasized that her reason for withdrawing the petition had nothing to do with prison conditions, asserting that a life sentence to her would be worse than death. When questioned about how she was treated by "people," including inmates and guards, the petitioner remarked, "I don't want them to be able to turn me into somebody cold and mean and cruel that doesn't care about anybody or anything except for living day to day life in a penitentiary." Finally, the petitioner testified that, in her opinion, more time on her medication would not persuade her to change her mind or to think through her decision more clearly. She stated that she had carefully considered her choice to proceed to execution over a period in excess of five years, explaining that she had not previously made the request out of concern for her family: "That's the reason I sit in here and cry, not because I don't want this, but because I don't want to hurt them . . . ." She insisted that "it's just really what I want and . . . I want to stay who I am, and I want to die being who I am."

### The Report of Dr. Kenner

The written report of Dr. Kenner, requested by the post-conviction court and ultimately produced at the June 25, 2003, hearing, was not formally filed with the clerk until August 4, 2003. There were references to interviews with the petitioner as late as May 23, 2002. The report basically acknowledged that the petitioner, while suffering a mental illness, knew and understood the effect

of her request to withdraw her post-conviction petition. Nevertheless, Dr. Kenner recommended that the petitioner should have nine more months on lithium as the treatment period for her mental illness "to the point that she can be a little more objective." After review of the contents of the report, the petitioner's counsel argued that the petitioner be allowed at least that amount of time to make the "life or death decision" and submitted that her prison environment had driven her to request termination of the proceedings. Counsel asserted that the petitioner was unable to accurately assess how much her decision was being shaped by "external forces."

The report provided by Dr. Kenner was filed in written form and included references to the other experts who had previously examined the petitioner while she was in custody. The content of the document indicated that Dr. Kenner had interviewed the petitioner on three different dates in December 2001, once during March of 2002, and once in May 2002. He noted that three other psychologists had evaluated the petitioner, he observed that a fourth doctor had submitted an affidavit, and he made reference to various letters, attorney interview reports, and mental health records as additional sources of information. As a part of the petitioner's medical history, he had determined that she described her father as being "mean and frustrated," often beating her with a belt. She had described her paternal grandmother as her "favorite person in the world," one who "practically raised" her because of her own mother's work schedule. According to the petitioner, her grandmother died of cancer when the petitioner was 12 years old. She reported that she felt a "great sense of loss," and had continually had dreams about her grandmother well after her death. She recalled that her father removed her from his home when her stepmother accused her of molesting a younger sister and "caus[ing] problems." The petitioner informed Dr. Kenner that her stepmother had tried other forms of discipline but that her father "would just break out the belt."

The Kenner report indicated that petitioner's mother was a nurse and her maternal grandfather, who owned a butcher shop and slaughterhouse, had died in the year preceding the hearing. The petitioner called her maternal grandfather's wife "a mean drunk." She told Dr. Kenner that she had often played with and become attached to animals which were later slaughtered by her grandfather as she watched. She described the slaughters as "fascinating" but also expressed the belief that she had been hurt by the killings because of her attachment to the animals. The petitioner also told of her mother's various boyfriends and husbands, including her first stepfather who spanked her with a leather strip "all the time" and who also abused her mother. She contended that one of her mother's boyfriends, identified as "Steve," brought pornographic videotapes for the petitioner to watch at age twelve. According to the report, he once hit her in the face with a belt, resulting in an assault charge. She described her second stepfather as "a beautiful, sweet fellow." He had married her mother when the petitioner was a teenager.

As further history, the petitioner informed Dr. Kenner that she had a blood clotting disorder and had undergone reconstructive surgery on her forehead at age fourteen as a result of a car accident during which she was thrown through a windshield. She told him that she had failed third grade and was sent to a juvenile evaluation center in eighth grade, where she later earned a GED. The petitioner also reported that she enrolled in the Job Corps Center in Knoxville with the hope of becoming a licensed nurse.

The report of Dr. Kenner, who had summarized the prior evaluations of the petitioner, indicated that all five of the treating experts agreed on the following basic facts:

Christa Pike is a 26-year-old woman who had been convicted of first-degree murder of a female acquaintance. Her childhood and upbringing were characterized by extreme neglect, abuse and violence by several family members including both parents. The only person to whom Ms. Pike bonded was her paternal grandmother who died when Pike was in elementary school. After her grandmother's death, Pike made her first suicide attempt.

Dr. Kenner's report also included the various experts' emphasis on different aspects of the petitioner's family history, including emotional neglect by her mother, inappropriate exposure to the slaughtering of animals at a very young age, inappropriate exposure to violence and horror through the media, sexual assaults, and physical abuse. A neuropsychological report by Dr. Eric Engum indicated that as a result of her car accident, the petitioner was "struck in the frontal area but suffered no residual cognitive deficits, personality changes or behavioral abnormalities." Dr. Engum found the petitioner's IQ of 111 to be in the "bright normal range." He found her "intellectual functioning and skills 'far exceed her stated level of educational achievement.'" Dr. Engum noted a history of drug abuse including severe dependance on marijuana since age 14 and found strong suggestions of "Borderline Personality Disorder." He described the petitioner as frequently feeling alienated from others and ineffective in interpersonal relationships. According to Dr. Engum, persons with borderline personalty disorder were likely to have poor anger control. Dr. Engum's summary of diagnoses of the petitioner included depressive disorder, obsessive compulsive disorder, post-traumatic stress disorder, disassociative identity disorder, borderline personality disorder and intermittent explosive disorder.

According to the Kenner report, Dr. Jonathan Pincus diagnosed the petitioner with explosive disorder, an explosive impulse responding to upsetting situations. It was his opinion that she also likely suffered from recurrent depression and had fantasies of extreme violence. Both Dr. Pincus and Dr. Stuart Grassian diagnosed the petitioner with obsessive compulsive disorder developed during her incarceration in "solitary confinement." Dr. Grassian, who did not personally interview the petitioner, had reviewed other reports provided by petitioner's attorneys. Dr. Grassian summarized the effects of solitary confinement, opining that "ordinary stimuli become intensely unpleasant, and small irritations become maddening." In Dr. Grassian's view, "stringent conditions of confinement also almost inevitably impair an individual's capacity to reflect and voluntarily choose between alternatives." He concurred with the suspicions of petitioner's counsel that the petitioner's desire to withdraw her post-conviction claims "may not be the result of voluntary, reasoned thought."

Dr. Kenner also reported that the petitioner's mental state had "changed dramatically" over the course of his five interviews with the petitioner in December 2001, March 2002, and May 2002. On December 20, he described her as in a "steady state"; on December 27, she was seen as sleep-deprived and angry at prison officials; on December 28, she was considered as "steady" again; on

March 13, after taking Depakote, a mood stabilizer, the petitioner showed signs of an adverse drug reaction, including hallucinations; and on May 23, she had been taking lithium and "her mental status had changed dramatically for the better."

During the personal interviews, the petitioner complained to Dr. Kenner that prison guards had read her mail and "trashed" her room. It was his observation that she "struggled with intense rage and irritability." The petitioner reported sleeping problems, staying awake for days at a time, a "real bad" temper during sleep deprivation, and thoughts of "horrific ways" of shutting up people who irritated her. She reported to Dr. Kenner that she began drinking and smoking at age nine. The petitioner avoided discussion with Dr. Kenner about an abortion she had at age 15 but did report having engaged in a fight with another girl and being shot in the leg. She also described being molested by "the town pervert" at age nine and told Dr. Kenner that she had sex for the first time at age 14 and having slept with "40 or 50 men" by age eighteen. The petitioner stated she thought she was in love with Tadaryl Shipp, her "charge partner" at the Job Corps. She explained that during the murder, she "took a lot of things out" on the victim "for years of stuff." She described herself as "extremely irritated" at the time and recalled that she "just wanted her to shut up." The petitioner remembered that she had slept one or two hours the night before the incident and reported to Dr. Kenner feeling relieved, nauseated, and excited after the murder.

The petitioner informed Dr. Kenner that she did not want to grow old in prison and did not want to be placed in the general population because she knew she was a violent person. She expressed an understanding that her options included federal court action and appeals. While on the drug Depakote, the petitioner reported that she saw bugs, a rat, and a spirit. In the March 13, 2002, interview, she stated she was sleeping more and feared that she was capable of "go[ing] off" and attacking someone. After the final interview on May 23, Dr. Kenner reported that the petitioner had settled down to "normal levels of mental and physical activities" and "had a new capacity to reflect on her thoughts and feelings." According to Dr. Kenner, she had indicated that the lithium was helping her, although she had expressed concern that she was not getting deep sleep. She told Dr. Kenner that she no longer got depressed for no reason and felt she was in better control of herself. The petitioner also reported that she had been researching electrocution versus lethal injection and informed Dr. Kenner that she remained firm in her decision to waive post-conviction remedies, asserting that "no drug or test will change that."

At Dr. Kenner's request, Dr. Pamela Auble had conducted psychological testing in January of 2002 and May of 2002. Dr. Auble observed that the petitioner had symptoms of borderline personality disorder whether or not she was taking a mood stabilizer (lithium). She noted that the petitioner was likely to be impulsive and irritable with poor temper control. Dr. Auble's findings indicated significant changes from the petitioner's mental state in January to her "new, treated personality" in May, showing a dramatic decrease in her anxiety, depression and mania.

As a result of his evaluation, Dr. Kenner concluded that the petitioner "does suffer from mental illnesses," but "[n]evertheless she has passed the cognitive part of that competency requirement; she has the knowledge and understanding to make such a decision." On whether the

petitioner's decision to waive her post conviction appeals qualified as rational, Dr. Kenner observed that this question "represents a far more complex determination than simply an understanding of her functional capacities, since both the prison conditions and her mental illness come together on that issue." Dr. Kenner believed that the petitioner decided to drop her appeals in her "pre-treatment state," before she had started taking lithium and her decision was based on her understanding that she would remain in "solitary confinement" while in prison. It was his view that in her pre-treatment state, the petitioner's "confinement had become intolerable." If released into the general population, the petitioner, in Dr. Kenner's opinion, would have become "a bad tempered predator." Dr. Kenner noted "a remarkable improvement" in the petitioner as a result of the lithium and recommended that "the Court consider giving Ms. Pike a period of a year to understand her new 'self.'" Dr. Kenner further recommended regular psychiatric care and the appointment of a referee to help the prison staff to give the petitioner more "freedoms." He concluded that Ms. Pike had "rational as well as irrational" desires to end her life.

After reviewing the content of the report, the post-conviction court questioned the petitioner extensively regarding her understanding of the right to pursue post-conviction relief, including her own counsel's belief that she had "strong" constitutional issues to present. The court specifically addressed the effect of a withdrawal of the petition. The court inquired whether the petitioner chose to accept Dr. Kenner's recommendation that her decision be delayed to allow more time for treatment of her mental diseases. There were other questions related to the voluntariness of her decision. Answering each inquiry, the petitioner was resolute in her desire to terminate her request for post-conviction relief. The post-conviction court concluded that the petitioner did suffer from a mental disease or defect; that she was "not prevented by her mental disease from understanding her options and positions available"; and, that the petitioner was "not prevented from making a rational choice" among her options.

After reviewing the report of Dr. Kenner and considering the testimony at the June 25, 2002, hearing, the post-conviction court determined that the petitioner was entering into her decision "freely and voluntarily," concluding that "Miss Pike has the right as a competent individual . . . to make a decision about her case, whatever all of us feel about that decision, and I grant her the motion to withdraw her appeals." The written "judgment setting execution date" was entered two days later on June 27, 2002, and an amended judgment was filed the following day. The execution date was set for August 19, 2002.

On July 8, 2002, the petitioner's counsel filed a notice of appeal and on July 26, the thirtieth day from the order of withdrawal, an additional notice of appeal, containing a supporting affidavit signed by the petitioner, was filed. The petitioner also joined in a motion asking the post-conviction court to vacate its June 27 and 28 judgments, to reinstate her post-conviction petition, and to set a date for an evidentiary hearing on the original allegations. Attached to the motion was the petitioner's sworn statement indicating her change in position and expressing a desire to "go forward" with the post-conviction petition. The statement included a handwritten addendum: "I still feel conflicted about what I want to do, but as of now I feel this is the only logical decision." In response, the state filed a motion to dismiss the appeal. On August 1, 2002, this court entered an

order granting the petitioner's motion for stay of execution and remanding the case to the post-conviction court for a hearing on the petitioner's motion to vacate the June 27 and June 28 orders. Christa Gail Pike v. State, No. E202-01612-CCA-RD-PD (Aug. 1, 2002). In pertinent part, this court ordered as follows:

> Upon careful consideration, this court concludes that the case should be remanded to the post-conviction court for a hearing on the petitioner's motion to vacate the June 27 and 28 orders and to set a date for an evidentiary hearing, which hearing will avail the post-conviction court the opportunity to hear testimony of the petitioner pertaining to the matters raised in her sworn statement of July 26, 2002. Further, if deemed appropriate, the court may proceed to hear the merits of the claims raised in the petition for post-conviction relief.

> It is, therefore, ORDERED that the petitioner's motion for stay of execution is GRANTED. It is further ORDERED that the case is REMANDED to the Criminal Court for Knox County. The state's motion to dismiss is DENIED. The remand to the trial court concludes the current appeal.

### Hearing on Remand

On February 20, 2003, a hearing was set to determine whether the petitioner should be permitted to retract her request to withdraw her appeals and reinstate her post-conviction petition. Petitioner's counsel argued that the order of the post-conviction court granting the motion to withdraw the petition had not become final based on the fact that the order was appealed under Tennessee Rule of Appellate Procedure 3, pursuant to Supreme Court Rule 28, Section 11 (c). Counsel pointed out that the notices of appeal and the petitioner's motion to withdraw her request asking for the dismissal of her petition had been filed within 30 days of the order approving withdrawal of the petition. Counsel further argued that because of "mental disease and defect, the petitioner was prevented from making a rational choice among her options."

In response, the state argued that the post-conviction court had, in fact, complied with the procedure adopted in Supreme Court Rule 28, Section 11, even though the rule had not been promulgated at the time the order approving the withdrawal was entered. Further, the state asserted that the medical report established the competency of the petitioner and that the new Rule 28, if applicable, did not provide for any period of delay for reconsideration as had been recommended by Dr. Kenner.

Initially, counsel for the petitioner acknowledged that the petitioner did understand what she was doing, "understood what was in her post-conviction petition," and was aware of its potential consequences. Counsel pointed out that the petitioner, while competent, was suffering from a mental illness, contending that she could not make a rational choice due to that illness. Counsel further asserted that although the petitioner had been on lithium for approximately three months at the time her petition was permitted to be withdrawn, she still didn't "understand . . . what that meant for her

-11-

life and that it would take some time to understand that . . . even though she was now getting fairly stable. . . ."  Counsel added, "I think she now understands. . . ."

At the hearing on remand, the petitioner confirmed her change of position and expressed a desire to re-instate her post-conviction petition.  She explained that she was "willing to do anything and everything that it took to get [her] out of the situation she was in and [that she] believed she had valid reasons to make her request at the time it was made."  She contended that she had not fully understood "exactly how final" her decision would be and the effect it would have upon her and her family.   The petitioner testified that she had thought about it and "realized that there was more to [her] life than being stuck in that little room" and that she had a reason to continue with her post-conviction claims.  The petitioner insisted that no one had influenced her to change her mind and contended that both the decision to withdraw her appeals and the decision to retract that request were her own.  The petitioner also reported that she had begun to take an anti-depressant to "level out" the lithium and that she had seen "great improvement."

At the conclusion of the hearing on remand, the post-conviction court first observed that the petitioner had a right to appeal the order granting her request to withdraw her post-conviction petition and had done so in a timely manner.  It also ruled as follows:

> Again, we are in a court of law bound by rules.  To me this is most akin to a decision to waive one's right to enter into a plea.  When one does that and they make a binding decision and the Court accepts that decision, just like in this case, even five minutes later, they cannot change their mind unless they can show that their will has been overborne or . . . they did not understand their rights.  Only then would a guilty plea be overturned."

The post-conviction court found that the petitioner's will was not overborne, "then or now." It concluded that the petitioner had simply changed her mind and "[u]nfortunately, I do not think she can just do that under this situation."  The court's written order was entered on March 10, 2003.  Two weeks later, counsel filed a notice of appeal to this court arguing that (1) an inmate under a death sentence should not be allowed to waive post-conviction review; (2) the hearing on the petition to withdraw her post-conviction claims did not afford due process; and (3) the petition was not legally withdrawn.

## Scope of Review

On appeal, the scope of review by this court is limited.  Findings of fact made by the trial court are conclusive on appeal unless the evidence preponderates against them.  State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993).  Accordingly, we are bound to affirm the judgment unless the evidence in the record preponderates against the findings of the trial court.  Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The burden of establishing that the evidence preponderates against the trial court's findings is on the petitioner.  Henley v. State, 960 S.W.2d 572,

579 (Tenn. 1997). When reviewing issues of law, or a mixed question of law and fact, this court's review is de novo with no presumption of correctness. Nichols, 90 S.W.3d at 586 (citing State v. Burns, 6 S.W.3d at 461).

## I. Issue of Withdrawal of a Post-Conviction Petition in a Capital Case

The petitioner first asserts that "allowing a death-sentenced inmate to forgo review of the constitutionality of her sentence of death denies the people of the state the right to ensure that death sentences are carried out only as to individuals who have a received a death sentence through a constitutional process." In support of the argument, the petitioner has cited State v. Martini, 677 A.2d 1106 (N.J. 1996), in which the New Jersey Supreme Court emphasized the "importance of post-conviction relief to ensuring the reliability and integrity of death sentences." In that case, the high court in New Jersey ruled that a death-sentenced inmate could not waive his right to prosecute an application for post-conviction relief. Id. at 1109. The petitioner submits that the same concerns should also lead this court to hold that in this state, an inmate under a sentence of death cannot waive the initial post-conviction review. The state responds that post-conviction review is not constitutionally mandated, even in capital cases, and may be waived if properly done by a competent defendant.

In State v. Martini, a conviction of capital murder and the sentence of death had been affirmed on direct appeal.[1] Thereafter, the public defender, over Martini's objection, sought post-conviction relief. After appointing a psychiatrist to evaluate Martini and following a competency hearing, the post-conviction court found that he was competent to waive post-conviction proceedings. On appeal, the New Jersey Supreme Court, noting that under New Jersey law a capital defendant could not waive a sentencing proceeding, the presentation of mitigating evidence at sentencing, or the direct appeal of his conviction and sentence, weighed the state's competing interests of achieving finality of litigation and ensuring the reliable imposition of the death penalty and ruled that post-conviction review was required to promote "consistency and reliability."[2]

> We have considered the other issues raised concerning the competency of Mr. Martini. We are satisfied that the trial court correctly resolved on the basis of psychiatric evidence before it that Martini is competent to make this decision and has voluntarily expressed a desire to prosecute no further appeals. We respect his choice. We have a constitutional responsibility to ensure reliability in the implementation of the death penalty. We shall discharge that responsibility with dispatch. We have accelerated the argument and decision of this appeal and will continue that practice until the matter is resolved.

---

[1] In addition, in a separate appeal, the New Jersey Supreme Court affirmed the death sentence after conducting a statutory "offender-oriented proportionality review" requested by the defendant. See N.J.S.A. 2C:11-3e.

[2] See Article 1, paragraph 12, of the New Jersey Constitution.

-13-

Id. at 1113-14. En route to its holding, the New Jersey court acknowledged that other jurisdictions did not hold similar views: "It is a natural reaction for some to wish to be rid of an admitted murderer who asks to be executed. The Court is nonetheless required to ensure the integrity of death sentences in New Jersey." Id. at 1112. In summary, Martini was not permitted to forgo post-conviction review of his death sentence.

Counsel for the petitioner submits that the State of Tennessee also has an interest in ensuring that the death penalty is reliably and consistently imposed, pointing out that our legislature has provided for automatic, direct appellate review of the conviction and sentence in all cases in which a sentence of death is imposed. See Tenn. Code Ann. § 39-13-206. The statutory duty to review death sentences "exists even in the absence of an appeal by the defendant," State v. Nesbit, 978 S.W.2d 872, 880 (Tenn. 1998), cert. denied, 526 U.S. 1052 (1999), and despite the defendant's failure to file timely a motion for new trial, id. at 881; cf. State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Martin, 702 S.W.2d 560, 564 (Tenn. 1985); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981).

Our supreme court has adopted rules uniquely applicable to capital cases. Rule 13 provides for the appointment of two attorneys to represent an indigent capital defendant and requires increased qualifications and compensation of counsel in capital as opposed to non-capital cases. See Tenn. S. Ct. R. 13, § 3. The rule further provides for the appointment of an investigative expert and other similar services "necessary to ensure that the constitutional rights of the defendant are properly protected." Id. at § 5(a). Further, in 1995, the legislature created the Post-Conviction Defender Commission and the Office of the Post-Conviction Defender to provide qualified counsel for indigent persons convicted and sentenced to death in this state. See Tenn. Code Ann. §§ 40-30-202; 40-30- 205(g).

At the same time, our supreme court has recognized the right of a competent defendant to direct his own defense. In doing so, a defendant may waive significant rights, even in a capital case. In Zagorski v. State, 983 S. W. 2d 654 (Tenn. 1998), the defendant adamantly instructed trial counsel not to investigate for possible mitigating evidence at his capital sentencing proceeding. While acknowledging the constitutional significance of mitigating evidence at a capital sentencing proceeding, our high court rejected Zagorski's claim that his counsel was ineffective for proceeding largely as he had instructed, holding that "[w]hen a competent defendant knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision." Id. at 659-60. In State v. Smith, 993 S.W. 2d 6, 20 (Tenn. 1999), our high court again rejected the argument "that a defendant who is represented by counsel may not waive the right to present mitigating proof [or] that such a waiver [would necessarily] violate the heightened reliability required in death penalty cases." Instead, our supreme court specifically held "that a defendant may waive the right to present mitigation proof so long as [he is] competent." Id.

This court has recognized that, "[t]o a large extent, the availability and extent of post-conviction remedies lie within the discretion of the legislature." Blair v. State, 969 S.W. 2d 423, 425 (Tenn. Crim. App. 1997). While making available post-conviction review, our legislature has left

the exercise of the privilege to the discretion of those convicted of crimes. In turn, Tennessee Rule of Appellate Procedure 3(b) simply provides that a defendant "*may* also appeal as of right . . . from a final judgment in a . . . post-conviction proceeding." (Emphasis added.) That position is consistent with the ruling of the post-conviction court in this instance.

After the proceedings in the case at issue, our supreme court established the specific procedure trial courts must follow before allowing an inmate under a sentence of death to withdraw his post-conviction petition. See Tenn. S. Ct. R. 28, § 11. The adoption of section 11 expresses an underlying policy that under appropriate procedural safeguards, post-conviction review in a capital case may be waived by a competent petitioner. Indeed, our high court has expressly held that "even a death-sentenced prisoner [might] recognize the justice of his sentence and . . . acquiesce in it." State v. Paul Dennis Reid, Jr., No. M1999-00803-SC-DDT-DD, slip op. at 3 (Tenn. 2003) (memorandum opinion and order) (quoting West v. Bell, 242 F.3d 338, 343 (6th Cir. 2001)).

Finally, in Murray v. Giarratano, 492 U.S. 1 (1989), inmates argued that even though indigent prisoners were not ordinarily afforded state-appointed counsel for post-conviction proceedings, the Eighth Amendment required that counsel be made available in a capital case. Their theory was that the Constitution requires post-conviction cases involving the death penalty to be treated differently from other post-conviction cases. Id. at 8, n.4. In rejecting the argument, the United States Supreme Court held:

> State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal. The additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed. We therefore decline to read either the Eighth Amendment or the Due Process Clause to require yet another distinction between the rights of capital case defendants and those in noncapital cases.

Id. at 10.

Our research indicates that no jurisdiction other than the New Jersey Supreme Court has adopted a bright-line rule mandating post-conviction review in every capital case, even when the challenge is over the objection of the death-sentenced inmate. No state constitutional provision, no legislative enactment, and no rule of procedure promulgated by our supreme court establishes a public policy prohibiting a death-sentenced inmate from waiving post-conviction review of a capital case. In consequence, the petitioner is not entitled to relief on this issue.

## II. Issues of Due Process

Next, the petitioner claims that the hearing to determine whether she could withdraw her petition and waive any further collateral attacks upon her convictions and sentences failed to meet

due process requirements, failed to comport with the standards adopted in Supreme Court Rule 28, section 11, improperly placed the burden of proof on the petitioner, and denied the petitioner of the opportunity to present supporting evidence. The state disagrees as to each assertion.

## II(a). Standard of Competency

In Rees v. Peyton, 384 U.S. 312 (1966), the United States Supreme Court set forth the standard for determining whether a criminal defendant is mentally competent to choose to forgo further appeals and collateral challenges to his conviction and sentence. In this appeal, counsel for the petitioner concedes that the Rees decision is a "clear starting point" for consideration of the question of waiver of post-conviction litigation by a capital defendant but argues that because the waiver of the right to a collateral attack was before the exhaustion of the state remedies, this court should adopt stricter standards.

In Rees, the petitioner filed a petition for habeas corpus relief in federal district court. The district court denied relief and the court of appeals affirmed. One month after filing a petition for writ of certiorari to the United States Supreme Court, the petitioner instructed his counsel to withdraw the petition and forgo further proceedings. Counsel refused, raising the question of the petitioner's competency to issue such instructions. The Supreme Court ruled there could be no disposition of the certiorari petition until the competence question was resolved. The Court directed the district court to "determine Rees' mental competence in the present posture of things, that is, *whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which substantially affect his capacity in the premises*." Id. at 314 (emphasis added).

In applying Rees, the Fifth Circuit Court of Appeals utilized a three part inquiry:

(1) Is the person suffering from a mental disease or defect?
(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

\* \* \*

If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative: if yes, the person is incompetent, if no the person is competent.

Rumbaugh v. Procunier, 753 F.2d 395, 398, 399 (5ᵗʰ Cir.), cert. denied, 473 U.S. 919 (1985). In Rumbaugh, the majority found that a factual inquiry was required to resolve the final issue. The dissent argued that the burden to prove competency should have been placed upon the government.

A criminal defendant's decision to forgo further appeals has been compared to a decision to enter into a guilty plea. See Groseclose ex rel. Harries v. Dutton, 594 F. Supp. 949, 956-57 (M.D. Tenn. 1984). "Given the necessity that a guilty plea be voluntary, waiver of post-conviction remedies that may result in execution of a criminal defendant *a fortiori* requires a competently and voluntarily made waiver." Id. at 957. The inquiry, then, involves more than a determination of a person's competency. In Comer v. Stewart, 215 F.3d 910 (9ᵗʰ Cir. 2000), the 9ᵗʰ Circuit, while endorsing the totality of the circumstances test, observed that "[e]ven if the district court finds that [the petitioner] is competent to withdraw his appeal, it must also determine the separate question of whether his purported decision is voluntary." The petitioner quotes the following passage:

> The issue thus becomes whether an individual is competent to choose to be executed –in short, to choose death, and whether he has made that choice voluntarily, knowingly, and intelligently.

Miller v. Stewart, 231 F.3d 1248, 1250 (9ᵗʰ Cir. 2000) (citing Rees, 384 U.S. at 313).

> The issue is whether [the petitioner's] conditions of confinement constitute punishment so harsh that he has been forced to abandon a natural desire to live. The district court shall conduct an evidentiary hearing to determine this issue as well as the separate issue of mental competence.

Comer, 215 F.3d at 917-918.

In this instance, the post-conviction court properly applied the standard established in Rees v. Peyton. The report of Dr. Kenner addressed each prong. While acknowledging that the petitioner suffered from a mental disease or defect, the post-conviction court ruled that the disease or defect did not preclude her appreciation of her legal position and the alternatives available, and did not prevent her from making a rational choice.

## II(b). The Adoption of Supreme Court Rule 28, Section 11

The petitioner placed the trial court in a unique situation by asking pro se to forgo further review of her case. Without the benefit of a specific rule or statute to direct its course, the post-conviction court reviewed relevant United States Supreme Court decisions and other case law and forged its own "road map." The procedure the trial court followed is in accord with the procedures later adopted by our supreme court. Rule 28, section 11, generally directs the nature of the relevant inquiry, as follows:

(A) Determination of Trial Court. Before allowing a petitioner under

sentence of death to withdraw the petitioner's post-conviction petition, the trial court shall address the petitioner personally in open court and ascertain that the petitioner

> (1) does not desire to proceed with any post-conviction proceedings;
>
> (2) understands the significance and consequences of withdrawing the post-conviction petition;  and
>
> (3) is knowingly, intelligently, and voluntarily, without coercion, withdrawing the petition;  and
>
> (4) is competent to decide whether to withdraw the post-conviction petition.

Specifically addressing the competency inquiry, the new rule further provides as follows:

> (B) Competency.
>
> (1) The standard for determining competency of a petitioner to withdraw a post-conviction petition and waive further post-conviction relief under this section is whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.
>
> (2) A petitioner is presumed competent to withdraw a post-conviction petition and waive post-conviction relief;  however, if a genuine issue regarding the petitioner's present competency arises during the hearing provided for in (A), supra, the trial court shall enter an order appointing at least one, but no more than two, mental health professionals from lists submitted by the State and counsel for the petitioner.  The order shall direct that the petitioner be evaluated by the appointed mental health professionals to determine the petitioner's competency and that the appointed mental health professionals file written evaluations with the trial court within ten days of the appointment unless good cause is shown for later filing.  Upon filing, the trial court clerk shall forward a copy of the written evaluations to counsel for the petitioner and to the State.
>
> (3) If a genuine issue regarding the petitioner's present competency exists after the filing of evaluations by the appointed mental health professionals, the trial court shall hold a separate hearing on the record, allowing the introduction of testimony, exhibits and evidence, to determine the petitioner's competency.  After the hearing, the trial court shall file detailed written findings of fact regarding the court's competency determination, which shall be included in the court's order granting or denying withdrawal of the petition.

As discussed, the newly adopted Rule 28, section 11, requires a determination that a withdrawal of a capital post-conviction petition is knowingly, voluntarily and intelligently made and that the petitioner is competent to make such decision under the Rees standard.  On the competency question, Rees provides only general guidance on the nature of the inquiry to be undertaken:

> To that end, it will be appropriate for the District Court to subject Rees to psychiatric and other appropriate medical examinations . . . . If the State wishes to obtain additional evidence for the federal inquiry by examining Rees in its own facilities, we do not foreclose such a supplemental course of action. The District Court will hold such hearings as it deems suitable, allowing the State and all other interested parties to participate should they so desire, and will report its findings and conclusions to this Court with all convenient speed.

Rees, 384 U.S at 314.

The Fifth Circuit Court of Appeals has observed that two conclusions may be gleaned from the Rees opinion. "First, the directive to hold 'such hearings as it deems suitable,' Rees, 384 U.S. at 314, clearly affords the district court a measure of discretion in determining the type and extent of procedures necessary to decide the issue of competency. Second, there is a presumption that psychiatric and other medical examinations will be included in the decision making process." Mata v. Johnson, 210 F.3d 324, 327-28 (5th Cir. 2000).

As indicated, the post-conviction court here did not have the benefit of Tennessee Supreme Court Rule 28, section 11, which was adopted after the ruling. Section (A) of the rule requires courts to ascertain that the petitioner is both "knowingly, intelligently, and voluntarily, without coercion, withdrawing the petition," and that the petitioner "is competent to decide whether to withdraw the post-conviction petition." Section (B) expressly adopts the Rees standard for determining the petitioner's competency. The post-conviction judge properly recognized the need for a separate inquiry into the related question of the voluntariness of her decision. Nevertheless, counsel for the petitioner argues that the proof "fell short" of the new standard. Counsel points out that section 11(B)(2) requires the court clerk to provide copies in advance of the hearing and that, in this instance, standards of due process required something more than making the report available on the date of the hearing, allowing time for review, and then initiating the proceeding. The argument is also made that section 11 (B)(3), requiring a hearing in the event that there is a genuine issue of competency, a hearing in compliance with due process, suggests that the expert should be present to testify and subject to cross-examination.

Because the rule was not in effect at the time of the hearing in this case, whether there was compliance with its terms cannot be controlling of the central issue. In this instance, the report depended upon personal interviews, relied upon the conclusions reached by the other experts who had evaluated the petitioner both before and after her trial, and was prepared after consideration of all other available data. Dr. Kenner had six months to evaluate the petitioner and to observe the changes in her demeanor after medication (the new rule requires the report within ten days after the appointment of the expert).

During the initial hearing, neither the petitioner nor her counsel lodged any objections to the accuracy or content of the report. Counsel for the petitioner conceded that Dr. Kenner had "correctly found [the petitioner] is competent." During her testimony, the petitioner agreed with Dr. Kenner's

assessment and repeatedly and articulately confirmed her full understanding of the options and her willingness to make a decision. Understandably, counsel for the petitioner did not make a request for a continuance, acknowledging full access to the findings of the other experts who had previously provided treatment. Before the hearing took place, counsel received the report, reviewed its content, and discussed its conclusions with the petitioner. The record does not suggest either a request for delay or any particular reason therefor. Under these circumstances, any error by the failure to provide the report earlier would have been harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967); State v. Carpenter, 773 S.W.2d 1 (Tenn. Crim. App. 1989).

## II(c). Burden of Proof

As a part of this argument, the petitioner argues that the post-conviction court should have departed from the traditional rule and placed the burden on the state to prove her competency to withdraw the petition. The argument is based in great measure upon the dissent in Rumbaugh, a view rejected by most courts. Prior to the competency hearing, the post-conviction court did warn the petitioner's counsel that "the burden of proof is on you . . . to show that she is not competent," beginning with the proposition that a person is presumed competent in all cases unless they are found incompetent. The post-conviction court expressly relied on Evans v. Bennett, 440 U.S. 1301 (1979), in which Justice Rehnquist granted a stay of execution on application of the mother as next friend based on the alleged incompetency of her son, who had chosen to withdraw all requests for post-conviction relief. Justice Rehnquist quoted with implicit approval that portion of the opinion in which the district court, finding no other grounds to allow a next friend petition, concluded that "the petitioner must fail unless the inmate is incompetent." Id. 440 U.S. at 1305.

The petitioner's counsel asserts that Evans, wherein a pretrial evaluation resulted in a finding of competency and the only evidence to the contrary was an affidavit from a psychiatrist whom Evans refused to be examined by, "says nothing about which party carries the burden of proof." While the language in Evans may not be so clear as suggested by the state, the burden of proof in a competency determination has traditionally been placed on those claiming incompetency:

> Supreme Court case law tells us that a "next friend" may sue in place of a death-sentenced prisoner only when that person clearly shows that the prisoner is not competent. Whitmore v. Arkansas, 495 U.S. 149, 164-66, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990); Rees v. Peyton, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966). Those holdings were in the context of cases where a prisoner sought to withdraw proceedings already pending in federal court, where the court clearly had jurisdiction to consider the withdrawal.

> In the rarer cases where there has been a failure to take any action in federal court, the basic principles have been the same. Harper v. Parker, 177 F.3d 567, 572 (6th Cir. 1999). See also Lonchar v. Thomas, 58 F.3d 588, 589 (11th Cir. 1995); Brewer v. Lewis, 989 F.2d 1021, 1025-26 (9th Cir. 1993); Rumbaugh v. Procunier, 753 F.2d 395, 398 (5th Cir. 1985). From these cases, it is clear that the burden is still

on the putative "next friend" to demonstrate, not simply assert, the incompetence of the prisoner.

West v. Bell, 242 F.3d 338, 341 (6th Cir. 2001). Further, in the context of competency to stand trial, this court has held that the burden is on the defendant to prove his incompetency by a preponderance of the evidence. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

In Smith by and through Smith v. Armentrout, 632 F. Supp. 503, 515, n.34 (W.D. Mo. 1986), however, the district court, "[c]onsidering the irreversible nature of the death penalty" and endeavoring to "resolve all doubts in favor of finding Smith incompetent," thus assigned the burden of persuasion to the state. Adopting the rationale of the dissent in Rumbaugh, the holding in Smith is another representation of the minority view. As indicated, however, the burden of proof on the competency question is generally placed on those claiming incompetency. While capital cases traditionally receive greater scrutiny and afford more stringent procedural safeguards, the burden to prove competency to waive a post-conviction claim should not shift to the state only because the case is a capital case. See Workman v. State, 41 S.W.3d 100 (Tenn. 2001).

## II(d). Dr. Kenner's Report

Counsel for the petitioner specifically contends that the post-conviction court's failure to provide the opportunity to question Dr. Kenner, who was appointed by the court well in advance of the hearing, violated fundamental elements of due process. Counsel submits that Dr. Kenner should have been present at the competency hearing and should have provided counsel sufficient time to review the report. The petitioner insists that the "need for Dr. Kenner's presence became vividly clear when the post-conviction court made a determination not to accept the conclusions of [its] own expert" to give her another nine months before adjudicating the issue. See U.S. Const. amend. XIV; Tenn. Const. art. I, § 16. The petitioner further argues that the Eighth Amendment to the U.S. Constitution requires that the fact-finding process in capital proceedings "aspire to a heightened standard of reliability." Ford v. Wainwright, 47 U.S. 399 (1986). The state responds that nothing in Rees or its progeny (or in the newly adopted supreme court rule) requires the production of live testimony from any appointed expert or binds the courts to adopt specific recommendations of the expert to the exclusion of all other evidence.

On November 7, 2001, upon determining that there should be a competency evaluation of the petitioner, the post-conviction court specifically directed Dr. Kenner to the Rees test and further directed counsel to provide "any information deemed relevant to the evaluation including, but not limited to, other psychological testing or reports, evidence or transcripts from the original trial in this case." The record contains an additional mental evaluation by Dr. George W. Woods, Jr., and a psychiatric affidavit of Dr. Stuart Grassian based on their review of materials provided by the petitioner's counsel. In addition to appointing Dr. Kenner, the trial court authorized the petitioner to be sent for further testing by Dr. Pamela Auble, a neuropsychologist. In performing his own examination of the petitioner, Dr. Kenner personally interviewed the petitioner, advised her of the non-confidentiality of their conversations, and, as previously indicated, included in his review prior

mental forensic evaluations of the petitioner by five other experts. He also examined the petitioner's mental health records and prison medical and disciplinary records, citing 15 different sources of information. As a result of his evaluation, Dr. Kenner provided an extensive report including his conclusions on the petitioner's competency under the Rees/Rumbaugh inquiry.

On the morning of June 25, 2002, about one month after her last consultation with Dr. Kenner, the petitioner confirmed to the post-conviction court that she still intended to withdraw her petition. The court then released Dr. Kenner's report to counsel and recessed until the afternoon in order to give the petitioner an opportunity to review the report with her counsel. In this appeal, petitioner's counsel contends that the few hours permitted for review was inadequate for proper preparation for the June 25 hearing and that an opportunity to directly question Dr. Kenner should have been afforded. Instead of objecting at the time of the proceeding or otherwise addressing Dr. Kenner's absence, however, counsel asked for the appointment of additional independent experts to assist them in addressing the competency issue. In response, the post-conviction court noted that it had previously authorized experts to assist the petitioner in preparation of the proceeding, that counsel had information directly relevant to the issues of the petitioner's mental status, and that those reports had been made a part of Dr. Kenner's evaluation. At the hearing, counsel conceded that Dr. Kenner "has probably correctly found, Miss Pike is competent," pointing out that "the issue becomes whether due to other things, . . . in light of her mental illness, whether other things such as prison conditions and other matters have overborne that will; and therefore, this is still not a knowing and intelligent waiver."

When the hearing resumed later in the day, the post-conviction court undertook a rights colloquy with the petitioner and questioned her extensively to ascertain that her decision was, in fact, voluntarily and knowingly made. The record reflects that the petitioner's attorneys were prepared and attempted to establish through testimony of witnesses Lisa Ratte, Jennifer Szostecki, and the petitioner that the petitioner's desire to withdraw her claim for relief was being driven by prison conditions and was thus involuntary. Other than defining the issue for adjudication, whether the withdrawal of the petition was knowing and voluntary, there were no objections to the procedure implemented. The only exception had to do with whether the petitioner or the state had the burden of proof as to competency. The testimony of the petitioner demonstrated a high level of intelligence. Its content was particularly persuasive on the decisive issues:

> I killed someone. I sat in this very courtroom with a jury that found me guilty and sentenced me to death. So if that many people decided that this is what I deserve and that that's what my punishment should be, then I'm ready for that. I've accepted that. . . . I don't want to live in the penitentiary for the rest of my life knowing that I'm going to die in there one way or another, whether I get a life sentence out of this or whether I keep my death sentence. I'm dying a little more each day, and I want to still be me when I go. I don't want to sit in there, get institutionalized, anymore than I already have. And the way the people treat me, inmates, guards or whatever, I don't want them to turn me into . . . somebody cold and mean and cruel that doesn't care about anybody or anything except for living day to day life in a penitentiary. It's like

pulling off a band-aid. I'd rather just go ahead and get it over with . . . now. But I hope that you can feel what I'm saying if you can't just really understand it through my words. <u>And I know that Dr. Kenner says that this medication or whatever is going to make me change my mind, but it's not.</u>

THE COURT: [P]erhaps it would give you an opportunity to think it through more clearly.

PETITIONER: I've been thinking it through ever since I got this sentence. And even though I've never . . . voiced it and I haven't just told everybody about it, it's been years. It's been about five years that I've been wanting this. <u>But it's just really what I want, and it's what I need as me being who I am</u>. I want to die being who I am.

(Emphasis added.)

In <u>Mata v. Johnson</u>, there was consideration of "whether the district court conducted a constitutionally adequate fact-finding inquiry to make a reliable determination of Mata's competency to abandon collateral review of his capital murder conviction and sentence." 210 F.3d at 327. The court observed that the extent of the inquiry must be determined on a case by case basis. In general, however, the inquiring court "could afford such petitioner adequate due process by ordering and reviewing a current examination by a qualified medical or mental health expert, allowing the parties to present any other evidence relevant to the question of competency and, on the record and in open court, questioning the petitioner concerning the knowing and voluntary nature of his decision to waive further proceedings." <u>Id.</u> at 331.

In this case, the trial court utilized each of the steps identified in <u>Johnson</u>. Further, after initially reviewing Dr. Kenner's evaluation report, the post-conviction court determined with the endorsement of counsel that Dr. Kenner's conclusions indicated that the petitioner was fully competent to waive further litigation. Under our new Supreme Court Rule 28, section 11, courts are not required to hold a separate hearing permitting the introduction of testimony and other evidence, as the court did in this case, unless a genuine issue regarding the petitioner's competency still exists after the filing of an evaluation by the appointed mental health professional. In this instance, the post-conviction court undertook that final precautionary step.

It is our conclusion, therefore, that the inquiry into the petitioner's competency and the voluntariness of her decision complied with basic due process requirements as set forth in <u>Rees</u> and its progeny. The absence of Dr. Kenner was not fatal to the process. Understandably, counsel for the petitioner did not object to the procedure employed. The petitioner adamantly sought the dismissal of her petition for relief, a position contrary to the wishes of her counsel, and provided her reasons therefor with particular articulation. It was only after the ruling and the petitioner's change of heart that the questions of due process were expressed. At the outset of the hearing, the petitioner had expressly agreed to the release of the report to counsel for each side and was specially advised that the "conclusions of their report do not mean that those are my conclusions." Counsel asked for

-23-

and received time to review the report and then met with their client. Chaplain Mark Forester, who had counseled with the petitioner for several months before the hearing, was given permission to meet with her. Further, the hearing appears to have been conducted in full compliance with Rule 28, Section 11, as subsequently adopted.

In Comer, 215 F.3d at 917, the district court made the following observation:

> The Supreme Court has held that a waiver of a petitioner's "right to proceed" is not valid unless, among other factors, it is "knowing, intelligent, and voluntary." Whitmore v. Arkansas, 495 U.S. 149, 165, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990) (emphasis added). "A waiver is voluntary if, under the totality of the circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998).

In this case, the post-conviction court properly directed its inquiry to the question of "whether or not Miss Pike is making a conscious, free choice, and that she is not . . . making this choice in an incompetent manner or a manner in which her will has not been overborne by other things at this point." The record reflects that the petitioner was questioned in much the same manner as if to ensure the entry of a valid plea of guilty. Through its questioning of the petitioner, the post-conviction court was able to hear and evaluate the petitioner as she explained why she had chosen not to pursue post-conviction litigation. The petitioner gave assurances that she fully understood her decision and its effect. Neither the petitioner nor her counsel sought additional time to review Dr. Kenner's report prior to the June 25, 2002, hearing or sought to present him as a witness. In our view, the record supports the determination that the petitioner knowingly, voluntarily and intelligently waived her right to pursue post-conviction relief. Under all circumstances, there was no denial of fundamental due process.

## II(e). Evidence of Rational Choice

The next issue is whether the post-conviction court erred by concluding that the petitioner was competent to make a rational choice among her various options.

In Lonchar v. Zant, it was held that application of the Rees test "involves a determination of (1) whether that person suffers from a mental disease, disorder, or defect; (2) whether a mental disease, disorder, or defect prevents that person from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder, or defect prevents that person from making a rational choice among his options." 978 F.2d 637, 641-42 (11th Cir. 1992) (citing Rumbaugh, 753 F.2d at 398.

In Rumbaugh, the explanation for the test was as follows:

> If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the

affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

Rumbaugh, 753 F.2d at 398-99.

In the case at issue, Dr. Kenner concluded as to the first two questions that 1) the petitioner did suffer from mental diseases; and 2) the petitioner "[n]evertheless . . . has passed the cognitive part of that competency requirement; she has the knowledge and understanding to make such a decision." As to the third and determinative question, whether her mental diseases prevented the petitioner from making a rational choice among her options, Dr. Kenner opined that the petitioner "has rational as well as irrational [sic] to wish her own death." He found that rational elements of her decision included her desire to take control of her situation rather than waiting for the litigation process to slowly take its course.

In stating his conclusions, Dr. Kenner observed that this question "represents a far more complex determination than simply an understanding of her functional capacities, since both the prison conditions and her mental illness come together on that issue." Dr. Kenner, who noted "a remarkable improvement" in the petitioner as a result of her taking lithium, further observed as follows:

> One might reason at this point that Ms. Pike's mental illness has responded to treatment and that improvement has removed a major impediment in her ability to make a rational decision to waive her post-conviction appeals. In my professional opinion her response to [l]ithium has allowed her to emerge from the push of her bipolar disorder as if she were a new person. Unfortunately, neither she nor TPW realize the magnitude of the changes that appropriate mental health treatment has wrought in Ms. Pike. She remains saddled with her old identity, and the TPW staff still regards her as an unpredictable, dangerous troublemaker. As a result of the lag time between the biological changes in her brain and changes in her self-concept and changes in how the prison's staff responds to her, in my opinion her decision to waive her post conviction appeals continues to be based on her old "mentally ill and suffering" self-concept necessary to forego such a fundamental right.

Dr. Kenner thus recommended that the post-conviction court consider giving the petitioner a period of a year to understand her new "self," explaining that if at that time "she asks to waive her post conviction appeals, then she would have made that decision with an experience of her confinement without the pain and serious distortions wrought by her mental illness."[3]

The petitioner, by her own testimony, rejected this portion of Dr. Kenner's conclusions,

---

[3] See Tenn. Code Ann. § 40-30-111(d). The final disposition of a capital case must be made within one year of the filing of the petition.

observing that nothing in the evaluation report had changed her decision. The record reflects that at the time of the hearing, the petitioner had been taking lithium for about three months and had not wavered in her decision. The request to withdraw the petition for post-conviction relief had taken place one year before the June 25, 2002, hearing. The petitioner testified that she did not want prison conditions to turn her into a different person and expressed assurances that her decision was not the result of prison conditions. After expressing an understanding that she was a convicted murderer living in prison, she insisted that her decision was not about privileges she no longer had.

The petitioner also acknowledged that she had considered the possibility of winning a new trial which might produce a different verdict, including the possibility of release. The petitioner confirmed that she had considered the possibility of receiving a life sentence rather than the death penalty. Recognizing the likelihood, however, that she would never have a normal life, with a family and children of her own, and that no one was going to take her out of prison to live in "Disneyland," she expressed a preference to waive further challenges to her conviction and sentence. She concluded that she did not want to grow old in prison, whether it was in segregation or in the general population.

Testimony of other witnesses, including Lisa Ratte and fellow inmate Jennifer Szostecki, confirmed that the petitioner's decision was not an impulsive one, but one she had contemplated for some time. According to the petitioner, she had begun to consider the option of being executed since the time of the initial sentence.

The post-conviction court observed that the petitioner had chosen to control the only aspect of her life that she could: whether to spend her remaining days in prison. While acknowledging Dr. Kenner's recommendation that its ruling be delayed to allow the petitioner further time on lithium to give her "more clarity of mind to consider her options," the post-conviction court nevertheless found that the petitioner understood all of her options, having pondered her decision for as long as five years and having discussed the matter with her attorneys, friends, family and others. The post-conviction court ultimately ruled that "Miss Pike is not prevented by the problem that she has from making a rational choice."

The record of the petitioner's testimony demonstrates that she clearly understood her legal situation; that is, if she was permitted to forgo post-conviction review and further appeals, her execution was imminent. Further, the petitioner expressed complete awareness that her counsel believed there was a strong likelihood that she would prevail on post-conviction review and that life imprisonment might be substituted for the penalty of death.

At the conclusion of the hearing, the post-conviction court ruled that the petitioner had made a rational choice, expressing a desire to avoid being incarcerated for the rest of her life either in segregation under a death sentence or among the general prison population if there was a life sentence. It concluded that the petitioner held a realistic belief that she would never be released from prison to enjoy a normal life. As indicated, Dr. Kenner specifically observed that as a result of treatment with lithium, the petitioner showed "normal levels of mental and physical activities," and

"had a new capacity to reflect on her thoughts and feelings."  Despite this "remarkable improvement," however, Dr. Kenner emphasized that the petitioner had remained firm in her decision to withdraw her request to dismiss her petition and that she had, in fact, given considerable research to the various possible methods of execution.

Based on its "full consideration of Dr. Kenner's report, evidence presented at the competency hearing and arguments of counsel," the post-conviction court ruled that the petitioner met the competency standards of Rees:

> Ms. Pike suffers from a mental disease but the disease does not prevent her from understanding her legal options regarding litigation and does not prevent her from making a rational choice among her options.  Therefore, Ms. Pike is competent to proceed pro se and may make the decision to abandon further litigation.

In our view, the evidence in this record does not preponderate against the post-conviction court's determination that the petitioner was competent to "appreciate [her] position and make a rational choice with respect to continuing or abandoning further litigation." Rees, 384 U.S. at 314. Although Dr. Kenner recommended a delay in the disposition of the petition with time for further medication and treatment, he conceded that she had "responded to her treatment," thereby removing "a major impediment in her ability to make a rational decision to waive her post-conviction appeals." Our scope of review on appeal is limited.  In context with the entire record in this cause, which is considerable, Dr. Kenner's suggestion to wait and see, even if ultimately prophetic as to the prospect that the petitioner might change her position, cannot be taken in isolation and treated as controlling on the central issue.  The post-conviction court afforded the petitioner every opportunity to withdraw her request for dismissal and the petitioner successfully persuaded the court that her choice was rational under all of the circumstances.

### III.  Issue of Whether the Petition was Withdrawn

The record reflects that the petitioner's counsel and then the petitioner timely filed notices of appeal from the June 27 and June 28 judgments resulting from the June 25, 2002, hearing.  In addition, the petitioner filed a motion asking the post-conviction court to vacate its judgment and reinstate her post-conviction petition.  The motion was accompanied by the petitioner's sworn statement reflecting her desire "to go forward" with her petition. The petitioner argues that the filing of these pleadings within 30 days of the entry of the court's judgment prevented the judgment from becoming final, thereby permitting unilateral reinstatement.  In response, the state contends that the filing of timely notices of appeal did not invalidate the judgment and simply allowed the petitioner to first ask for reconsideration and then seek any appellate remedy.

The petitioner argues that the "general rule in Tennessee is that a judgment becomes final thirty days after entry unless a timely notice of appeal or a specified post-trial motion is filed." State v. Green, 106 S.W.3d 646, 648 (Tenn. 2003) (citing Tenn. R. App. P. 4(a), (c)); State v. Peele, 58 S.W.3d 701, 704 (Tenn. 2001); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996).  Further,

"[i]n a criminal case, when a notice of appeal is filed, the jurisdiction of the Court of Criminal Appeals attaches, and the trial court loses jurisdiction." Green, 106 S.W.3d at 648 (citing Pendergrass, 937 S.W.2d at 837).

On appeal, this court remanded this matter to the post-conviction court, ruling as follows:

[T]he case should be remanded to the post-conviction court for a hearing on the petitioner's motion to vacate the June 27 and 28 orders and to set a date for an evidentiary hearing, which hearing will avail the post-conviction court the opportunity to hear testimony of the petitioner pertaining to the matters raised in her sworn statement of July 26, 2002. Further, if deemed appropriate, the court may proceed to hear the merits of the claims raised in the petition for post-conviction relief.

By denying the state's motion to reconsider, our court ruled that the trial court's June 27 and June 28 orders were final, appealable judgments. This court ruled that the approval of the petitioner's withdrawal of her post-conviction petition "terminated further litigation and set an execution date." By comparison, Rule 28, section 11, provides simply that "the order of the trial court finding the petitioner competent and dismissing the petition may be appealed under T.R.A.P. 3." In our view, the orders qualify as a final judgment specifically appealable under Rule 3(b), T.R.A.P. (providing that a defendant may appeal as of right "from a final judgment in a . . . post-conviction proceeding").

In the alternative, the petitioner submits that if the post-conviction court correctly analogized the withdrawal of a post-conviction petition to the withdrawal of a guilty plea, she had thirty days from the trial court's acceptance of the withdrawal of her petition to change her mind. The state responds that the analogy is correct but, as with a guilty plea, the withdrawal of a post-conviction petition must be supported by more than a change of heart. It submits that, once accepted, a plea of guilt is binding and may be withdrawn only under limited circumstances. See State v. Hodges, 815 S.W.3d 151, 153 (Tenn. 1991) (only the knowing and voluntary nature of the plea may be challenged).

At the outset, the post-conviction court properly compared the petitioner's request to waive any post-conviction remedy to the offer of a guilty plea. In our assessment, the petitioner's motion to withdraw her request is comparable to the withdrawal of a guilty plea. The latter situation is specifically covered by Rule 32 of the Tennessee Rules of Criminal Procedure. The standard for review of a motion to withdraw a guilty plea is also expressly set forth in the rule. See Tenn. R. Crim. P. 32(f) (providing that a plea of guilty may be withdrawn upon a showing of "any fair and just reason" before sentence is imposed; and "to correct manifest injustice" after sentencing, but before a judgment). The standard for reviewing a motion to withdraw a request to waive post-conviction review and further litigation is not similarly addressed by rule or otherwise. The newly enacted Tennessee Supreme Court Rule 28 expressly states that the Rules of Criminal Procedure do not apply to post-convictions proceedings except as specifically provided. See Tenn. S. Ct. R. 28, § 3(B). Rule 28, section 11, does not address the question.

In this court's view, the order granting the petitioner's request to withdraw her post-conviction petition and waive further litigation was a final judgment. This court must, therefore, reject the petitioner's argument that her petition "was never legally withdrawn." Moreover, nothing in the record suggests that her will was overborne when she chose to withdraw her petition and counsel for the petitioner has not demonstrated how the judgment of the post-conviction court, regardless of the severity of its consequence, was manifestly unjust. The state is entitled to finality of litigation when appropriately weighed against a goal of reliability in a process which results in the imposition of the death penalty.

## Conclusion

When asked by the post-conviction judge whether additional time or treatment would affect her decision, the petitioner responded as follows:

> The reasons that I have for wanting this, none–of that will change my reasons. It would be different if my reasoning was because I was in segregation or if my reasoning was because I was having a problem being nervous or manic or anything like that. [T]hose aren't my reasons. And it's not that I don't see a future for myself; that's because I do. I realize that I could be in general population and help people and be productive or whatever and have that life. But I would not be living. That would be a dreadful existence for me.

> And a life sentence for me is . . . worse than death for me because I can't see myself just growing old watching my family and my friends die and maybe getting sick and having no one to take care of me.

In the post-conviction setting, "due process considerations . . . apply . . . in a capital case." Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). In Sample v. State, 82 S.W.3d 267, 273-74 (Tenn. 2002), our supreme court ruled that "principles of due process are flexible and require balancing of a petitioner's liberty interests against the [s]tate's finality interests on a case by case basis." See also Van Tran v. State, 66 S.W.3d 790, 812 (Tenn. 2001). On a policy basis, the grant of permission to reinstate a properly withdrawn post-conviction petition without grounds other than a change of position would tend to trivialize the importance of each and every stage of a process designed to assure reliability in result.

From our careful consideration of the entire record, it is our view that the evidence supports the post-conviction court's finding that the petitioner competently and voluntarily waived her right to pursue post-conviction review. The very words of the petitioner in the June 25 hearing serve as a testament to her resolve. It is our further view that the burden of proof, under circumstances such as these, is upon the petitioner to establish her incompetence and that she was unable to do so in this instance. The fact-finding inquiry afforded the petitioner due process. There are no grounds which would warrant a reversal of the post-conviction court's refusal to allow reinstatement of the post-conviction petition. Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE